UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NELSON ANDRES BARBOSA
BALLESTEROS, on behalf of
A.F.B.R., a minor child,

        Petitioner,

    v.

RAQUEL MILENA RINCON RUIZ,

        Defendant.

No. 24 CV 8518

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

On September 17, 2024, Nelson Andres Barbosa Ballesteros petitioned for the return of his minor child, A.F.B.R., to Canada from the United States, where A.F.B.R. was located with his mother, Raquel Milena Rincon Ruiz, pursuant to the Convention on the Civil Aspects of International Child Abduction ("the Convention") and the International Child Abduction Remedies Act ("ICARA"). On January 28, 2025, the magistrate judge overseeing settlement efforts spoke to counsel for Ballesteros and counsel for Ruiz, "confirm[ed] that the case has settled," and directed the parties "to file any settlement-related order(s)/stipulation to dismiss with the District Judge as soon as possible." [45]. Two weeks later, after no such documents had been filed with this Court, Ruiz moved to enforce the settlement. [46].

Because the parties reached an enforceable settlement agreement on January 28, the Court grants that motion.

## I.    Legal Standards

Along with state courts, district courts of the United States have concurrent original jurisdiction over actions arising under the Convention. 22 U.S.C. § 9003. Because settlement agreements are a sort of contract, "[s]tate contract law governs issues concerning the formation, construction, and enforcement of settlement agreements." *Beverly v. Abbott Lab'ys*, 817 F.3d 328, 333 (7th Cir. 2016).

## II.    Background

Ballesteros and Ruiz are the parents of the minor child A.F.B.R. [1] ¶¶ 5–6; [27] ¶¶ 5–6. A.F.B.R. was born in Venezuela, but the family later moved to Colombia. [1]; ¶ 9 [27] ¶ 9. In August 2022, the family fled threats of violence in Colombia, moving initially to the United States and then to Canada, where, according to Ballesteros, he sought refugee status on behalf of himself and A.F.B.R. in March 2023. [1] ¶¶ 9–11; [27] ¶¶ 9–11.

Ballesteros and Ruiz ended their relationship in June 2023 but maintained an verbal parenting arrangement of A.F.B.R., who attended school in Canada. [1] ¶¶ 12–14; [27] ¶¶ 12–14. But in December 2023, Ruiz brought A.F.B.R. to the United States, eventually coming to the Northern District of Illinois, where Ruiz and A.F.B.R. still reside. [1] ¶¶ 14–18; [27] ¶¶ 14–18. Ballesteros, who still resides in Canada, maintains that Ruiz took A.F.B.R. to the United States without his knowledge or consent. [1] ¶ 14–15.

On September 17, 2024, Ballesteros petitioned under the Convention for A.F.B.R.'s return to Canada, which Ballesteros argued was the child's habitual

residence. [1]. Through Court-appointed counsel, Ruiz contested the petition, and the Court entered a discovery schedule and set a trial date. [26], [27].

But at a status hearing on January 7, 2025, the parties orally moved to stay discovery pending ongoing settlement discussions. [40]. The Court granted that motion and referred the parties to a magistrate judge for a settlement conference. *Id.*; [41]. On January 28, 2025, the magistrate judge spoke to counsel for Ballesteros and counsel for Ruiz and "confirm[ed] that the case has settled." [45]. At that point, the magistrate judge terminated the referral. *Id.* All that remained was for the parties to file any settlement-related orders and/or stipulations with the Court so the case could be dismissed. *Id.*

Instead, on February 11, 2025, Ruiz moved to enforce the settlement agreement, asserting that Ballesteros was "attempt[ing] to renege on the settlement and [] refusing to sign the agreed order unless old terms are re-negotiated and new terms are included." [46] ¶ 3. In his response to Ruiz's motion, Ballesteros concedes that he "was initially in agreement with the proposed agreed order that had been circulated as of January 28, 2025" but that "he now has grave concerns about how recent changes in federal U.S. policy towards undocumented immigrants will affect not only his ability to visit with his child, as previously intended under the terms of the draft order, as well as his son's wellbeing and ability to remain on U.S. soil on an ongoing basis." [51] ¶ 4 (citing Executive Order 14159, "Protecting the American People Against Invasion," 90 Fed. Reg. 8443 (Jan. 20, 2025)).

The Court held a hearing on March 17, 2025, on Ruiz's motion. [54] During that hearing, counsel for Ballesteros conceded (twice) that the parties had reached an agreement on January 28, 2025.

## III.   Analysis

State law governs settlement agreements, *see Beverly,* 817 F.3d at 333, so the Court first considers whether an agreement exists under Illinois law,[1] and concludes that it does.

As a preliminary matter, that Ballesteros has not actually signed the settlement agreement does not help him here, because "oral agreements are enforceable (and have been for centuries under the common law)." *Elustra v. Mineo*, 595 F.3d 699, 708 (7th Cir. 2010). Under Illinois law, "[o]ral settlement agreements are enforceable if there is an offer, an acceptance, and a meeting of the minds between the parties regarding the terms of the agreement." *Cnty. Line Nurseries & Landscaping, Inc., ex rel. Bankr. Tr. v. Glencoe Park Dist.*, 2015 IL App (1st) 143776 ¶ 33.

The Court need not work through the elements of offer, acceptance, and a meeting of the minds because Ballesteros conceded those points in his briefing, [51] ¶ 4, and at the March 17 hearing. Likewise, Ballesteros does not dispute that the essential terms of the agreement are sufficiently "definite and certain," *Quinlan v. Stouffe*, 355 Ill. App. 3d 830, 837–38 (4th Dist. 2005), nor does he identify any other

---

[1] Under the default rule the Court would apply the law of the forum state, *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010), Ruiz assumes Illinois law applies, *see* [46] at 10, and Ballesteros does not object to this choice of law.

defect to contract formation under Illinois law. And the Court can readily "ascertain the parties' agreement from the stated terms and provisions." *Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007). Indeed, Ballesteros would be hard-pressed to mount a challenge in this regard given that, based on the uncontested facts before the Court, his attorney provided the operative draft used in settlement negotiations. [46-1] at 12; *Sherwood Commons Townhome Owners Ass'n, Inc. v. Dubois*, 2020 IL App (3d) 180561, ¶ 31 (any ambiguities in contract language construed against drafter). The parties have thus reached a valid settlement agreement.

Ballesteros now seeks to negate that agreement because "he now has grave concerns" about federal immigration policy. [51] ¶ 4. But "[b]uyer's remorse … cannot undo a contract to which all parties have given their assent and for which all of the conditions precedent have been fulfilled." *Newkirk v. Vill. of Steger*, 536 F.3d 771, 775 (7th Cir. 2008); *see also Glass v. Rock Island Ref. Corp.*, 788 F.2d 450, 454 (7th Cir. 1986) ("A party to a settlement cannot avoid the agreement merely because he subsequently believes the settlement insufficient."). This is especially true when both parties were aware of the cause of the buyer's remorse—in this case, changes to federal immigration policy—before they reached the agreement. As noted earlier, the Executive Order to which Ballesteros cites was issued eight days the parties finalized their agreement. *See* [51] ¶ 4 (citing Executive Order 14159, "Protecting the American People Against Invasion," 90 Fed. Reg. 8443 (Jan. 20, 2025)).

At the March 17 hearing on Ruiz's motion, Ballesteros argued that after January 28, 2025, the parties agreed to re-engage the magistrate judge in settlement

negotiations to address aspects of the custody arrangement. By making this later agreement, Ballesteros maintained, the parties invalidated the agreement they reached on January 28. For the reasons that follow, the Court is not persuaded by this contention.

Even if the parties agreed sometime after January 28 to re-open settlement negotiations before the magistrate judge (to be clear, the Court is not making such a finding), the January 28 settlement agreement would still be enforceable. Because the parties entered into a valid settlement agreement on January 28, and Ballesteros identifies no valid basis to dissolve it, the Court must enforce the terms to which Ballesteros agreed. Those terms include a provision under which Ballesteros's petition was deemed withdrawn with prejudice. *See* [46-1] at 37. As of January 28, 2025, therefore, the details of A.F.B.R.'s custody were out of the Court's hands. The Court's jurisdiction had been premised solely on the Hague Convention action; "child custody decrees remain outside federal jurisdictional bounds." *Marshall v. Marshall*, 547 U.S. 293, 308 (2006).

Thus, even assuming the parties had agreed at some point after January 28 to re-open settlement negotiations with the magistrate judge, and even assuming that by reaching that latter agreement the parties invalidated their former one, the Court could not enforce the latter agreement. The magistrate judge already had terminated the Court's referral for settlement-related purposes, *see* [45], and the Court could not have re-referred this matter to the magistrate judge for further settlement negotiations because it would have lacked jurisdiction to do so. *See McGoey v. Brace*,

6

2022 IL App (1st) 210322, ¶ 19 ("If the court acts to resolve questions or provide relief beyond its jurisdiction, its orders are void.").

As with any contract, the parties may of course mutually agree to changes in their custody arrangement. Nothing stops them from continuing to negotiate the details of their custody arrangement—either on their own or with the assistance of a family court. Indeed, the parties' settlement agreement expressly contemplates that latter possibility. *See* [46-1] at 39 (asserting that if Ruiz "plans on relocating from the State of Illinois, the parties will enter into a formal custody agreement in a family law court); *id.* at 40 ("If formal family law custody orders are in place at a later date, those orders will control and supersede this agreement in the event of inconsistencies or disputes.").

But as far this Court's involvement goes, that came to an end with the enforceable settlement agreement into which the parties entered on January 28. Ruiz's motion is therefore granted.

## IV.   Attorney's Fees

In addition to moving to enforce the settlement agreement, Ruiz's counsel also moves for $25,734.80 in attorney's fees "for the time spent negotiating this settlement agreement." [46] at 13; [55-1] at 2. The rationale for this request is that Ballesteros's "reversal [on the settlement agreement] forced [Ruiz's] pro bono counsel to devote

substantial and unnecessary time and resources to enforcing a resolution that should have ended the litigation months ago." [55] at 1.[2]

But each party generally bears their own attorney's fees, *see* Fed. R. Civ. P. 54(d), and the same sentence of the settlement agreement that compels Ballesteros to withdraw his petition under the Convention also directs that "each party bear[s] their own fees and costs." [41-1] at 37. Ruiz suggests that Ballesteros's attempt to reject the settlement agreement is "bad faith conduct" within the Court's inherent power to sanction, and that $25,734.80 in attorney's fees would be an appropriate sanction. [55] at 2 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)). In advancing this argument, Ruiz relies on *McCandless v. Great Atl. & Pac. Tea Co., Inc.*, 697 F.2d 198 (7th Cir. 1983), where the Seventh Circuit upheld a sanction of $1,000 in attorney's fees against plaintiff's attorney after finding bad faith based on "(1) the obvious meritlessness of [a statutory] claim; (2) the failure to provide any factual or legal support for the sundry constitutional claims; (3) counsel's omission of a key sentence from a quotation; and (4) the failure to respond to defendant's motion for fees and costs," *id.* at 201.

The Court sees no reason to depart from the so-called "American rule" that each party bears its own attorney's fees.[3] Ballesteros's challenge to the settlement

---

[2] The Court notes that while Ruiz requests attorney's fees for 29.75 hours of work, a significant percentage of those hours predate Ballesteros's attempt to reject the agreement. *See* [55-1] at 1.

[3] Ballesteros also argues that neither the Convention nor ICARA support a request for attorney's fees. *See generally* [56]. The Court acknowledges this argument but does not delve into its merits.

agreement is not sufficiently contumacious as to provide grounds for a monetary sanction—particularly where Ballesteros has conceded that the parties entered into an enforceable settlement agreement on January 28. *McCandless* involved litigation behavior that was substantially more burdensome and vexatious than anything Ballesteros has done. [4]

## V.   Conclusion

For the reasons set forth in this opinion, the Court grants Ruiz's motion to enforce the settlement agreement. [46]. The parties are given until April 17, 2025, to sign the settlement agreement and to file an agreed order of dismissal. In the event this does not occur, the Court hereby declares that the version of the settlement agreement circulated among the parties on January 28, 2025, is binding on the parties and will terminate the case sua sponte at close of business on April 17, 2025.

Upon termination of the case, the Clerk of Court is directed to release the passports for Ruiz and A.F.B.R. that had been previously surrendered [20] to Ruiz or Ruiz's counsel of record.

ENTER: 4/9/25

_____
Georgia N. Alexakis
United States District Judge

---

[4] In declining to award Ruiz's counsel attorney's fees, the Court does not suggest that Ruiz's counsel—who was appointed by the Court—did not provide Ruiz (and this Court) with valuable services. The Court is similarly appreciative of the services provided by attorney Gloria Rodriguez, the Court-appointed guardian ad litem for A.F.B.R.